Argued May 5, affirmed as modified June 24, petition for
rehearing denied, former opinion modified
November 25, 1959

# LAMB-WESTON, INC. ET AL *v.* OREGON
# AUTOMOBILE INSURANCE CO.

341 P. 2d 110
346 P. 2d 643

*John H. Kottkamp,* Pendleton, argued the cause for appellant. With him on the brief were Kilkenny & Fabre, of Pendleton.

*Carl G. Helm, Jr.,* of La Grande, argued the cause for respondents. On the brief were Helm & Neely, La Grande, and Minnick & Hahner and James B. Mitchell, of Walla Walla, Washington.

Before McALLISTER, Chief Justice, and ROSSMAN, LUSK, WARNER, PERRY and CRAWFORD, Justices.

PERRY, J.

Defendant appeals from a judgment in the sum of $3,399.23. The case was tried without a jury. There are two assignments of error, the first listing eight subdivisions, and the second, two. The first assignment, in general, challenges rulings of the trial court in denying motions for nonsuit and for judgment for defendant. The second assignment of error raises the question of whether or not the trial court erred in entering judgment against the defendant for the entire loss, instead of prorating the loss between the two insurers.

The essential facts are these: The plaintiff Lamb-Weston, Inc., an insured of the plaintiff St. Paul Fire and Marine Insurance Company, leased a truck from Dick Shafer for its use in connection with its business of canning and freezing peas. This included hauling water to crews in the pea fields. Nathan Cole, employee of Lamb-Weston, Inc., drove the truck. The evening of June 18, 1956, Cole was driving the truck to Elgin, Oregon, where he resided, for repair of faulty brakes and gears, a condition he had noticed for some little time. He had been advised to have the brakes repaired in Elgin. About two miles from Elgin his axle refused to "engage", his engine died, and his brakes would not hold in descending a grade and he lost control of the truck and crashed into and damaged a warehouse of the Union County Grain Growers. The Union County Grain Growers demanded damages and threatened suit. Plaintiff Lamb-Weston, Inc., settled the claim, borrowing the amount paid from its insurer St. Paul Mercury Indemnity Company, a subsidiary of St. Paul Fire & Marine Insurance Company, on a "loan receipt."

Defendant had, prior to this accident, issued its policy of insurance protecting Shafer against liability for property damage resulting from the operation of the leased truck. This policy contained an "omnibus" clause extending the protection afforded Shafer to "any person or organization legally responsible for the use thereof, * * *" with Shafer's permission. The insurance contract also contained these provisions:

> "The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the accident.

"*   *   * if the insured has other insurance against a loss covered by this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declaration bears to the total applicable limit of all valid and collectible insurance against such loss.

"No action shall lie against the Company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after trial or by written agreement of the insured, the claimant and the Company."

The policy also contained this clause:

"*   *   * The Company shall: (a) Defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit it deems expedient."

Plaintiff Lamb-Weston, Inc., notified defendant of the threatened suit and the latter denied liability and refused to pay or recognize the claim. Thereafter, on July 9, 1956, defendant sent the following letter to plaintiff St. Paul Fire & Marine Insurance Company:

"This will confirm our understanding to the effect that you may settle the property damage claim of Union County Grain Growers for the approximate amount of Thirty-four Hundred Dollars ($3,400.00), and that the payment of said sum by you will not be construed to waive in any way your right to contend that our policy of insurance covers the loss."

Acting thereon, plaintiffs settled the claim. The judgment from which this appeal was taken resulted from plaintiffs' effort to collect under the terms of defendant's policy for its payment of damages to the Union County Grain Growers.

The defendant contends under its first assignment of error that it is not liable under its policy contract, because (1) it was not established that Lamb-Weston, Inc., was in fact negligent and, therefore, defendant was not liable; (2) Lamb-Weston, Inc., failed to plead or prove it had complied with the provisions of the policy, to be complied with by an assured; (3) Lamb-Weston was not another insured within the provisions of the policy, because at the time of the accident the truck was not being operated with the consent of its named insured Mr. Shafer.

■ The defendant's first contention is entirely without merit. There is ample evidence Lamb-Weston, Inc., authorized and permitted a known defective motor vehicle to be operated by its agent upon the highway and thus created the occurrence.

■ The second contention of the defendant is likewise without merit. The plaintiffs in their complaint alleged:

"That said Union County Grain Growers demanded that plaintiff Lamb-Weston, Inc., pay for such loss and threatened to sue said plaintiff therefor; that said plaintiff, as an additional assured under said automobile insurance policy, requested defendant to perform its insurance contract, to settle the claim of Union County Grain Growers and to save plaintiff Lamb-Weston, Inc., harmless therefrom; that defendant, in violation of the terms of defendant's insurance contract, refused and continues to refuse to pay said claim or to recognize any responsibility therefor."

This is an allegation to the effect that defendant denied to Lamb-Weston, Inc., as another insured, the coverage of its policy. While it is true that one suing on a contract must allege and prove performance of its conditions upon his part, it is also well-established in the law that if he has not performed he may allege and prove in lieu thereof a valid excuse therefor. *Jaloff v. United Auto Indemnity Exch.*, 121 Or 187, 253 P 883; *Waller v. City of New York Ins. Co.*, 84 Or 284, 164 P 959. A valid excuse is established, which releases the insured from complying with the provisions of the policy against settlement of a claim without the insurers consent and those requiring that the claim be reduced to judgment, when the insurer denies liability under the contract and refuses to defend its assured. *Jaloff v. United Auto Indemnity Exch.*, supra. See cases cited in annotations 142 ALR 809, 812.

■ We also find no merit in defendant's third contention, for while there is evidence that Lamb-Weston, Inc., intended to use the truck only for hauling water in the field, it is also quite clear that bailment was not thus restricted. In fact, the terms of the bailment were that Lamb-Weston was to maintain the truck and from the evidence we gather one of the purposes of their agent Cole in driving the truck to Elgin was to have it repaired.

■ It is also argued, the loan receipt arrangement was a "sham and subterfuge." Oregon, however, recognizes these transactions as entirely legal and effective, depending upon the intention of the parties. *Furrer v. Yew Creek Logging Co.*, 206 Or 382, 292 P2d 499. Generally, see 29 Am Jur 1002, Insurance § 1337. Here there is no evidence of intention other than as expressed in the instrument itself. We conclude a valid borrower-lender arrangement was intended and effected.

Referring now to the second issue presented, the trial court in its findings of fact found that defendant was the primary insurer and thereon based its conclusion of law that defendant was liable to indemnify the plaintiffs for their entire loss from the occurrence. The defendant duly excepted to the finding of fact and conclusion of law and proposed a conclusion of law that it was liable for but one-half as its share of the loss.

This issue, which is of first impression in this jurisdiction, presents a question of importance only as between the insuring companies, which bears upon the financial responsibility of each for the accrued loss, for it must be conceded by each insurance company that if the other was not an insurer against this occurrence then it would be liable for the full amount.

For a complete understanding of this issue it is necessary to set forth the provisions of the insuring policies and for convenience in this part of the opinion the plaintiff St. Paul Fire and Marine Insurance Company will be hereinafter referred to as St. Paul, and the defendant Oregon Automobile Insurance Company will be referred to as Oregon.

The St. Paul policy contract, which insured the plaintiff Lamb-Weston, Inc., defines "insured" as follows:

"The unqualified word 'Insured' includes the Named Insured and also includes (1) under Coverages A and C, except with respect to the ownership, maintenance or use of automobiles while away from premises owned, rented or controlled by the Named Insured or the ways immediately adjoining, any executive officer, director or stockholder thereof while acting within the scope of his duties as such, and any organization or proprietor with respect to real estate management for the Named Insured, (2) under Coverages A and B, any person

while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the Named Insured or with his permission, and any executive officer of the Named Insured with respect to the use of a non-owned automobile in the business of the Named Insured. * * *"

This policy also provided:

"If the Insured's liability under this policy is covered by any other valid and collectible insurance, then this policy shall act as excess insurance over and above such other insurance."

The Oregon policy, which was purchased by Mr. Shafer, owner of the truck, defines "insured" as follows:

"With respect to the insurance for bodily injury liability and for property damage liability the unqualified word 'insured' includes the named insured and, except where specifically stated to the contrary, also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use is with the permission of the named insured."

With reference to "other insurance," this policy provides as follows:

"* * * if the insured has other insurance against a loss covered by this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of all valid and collectible insurance against such loss; * * *"

■ It is, therefore, at once apparent from a consideration of the above policy provisions that each company by its "other insurance" clause seeks to limit its liability if other insurance is available to pay a part

or all of an insured's loss. This is demonstrated by the fact that St. Paul provides that its policy can only be treated as "excess insurance over and above" other "valid and collectible insurance," and the Oregon policy can be treated only as paying a proportionate share if there is other "valid and collectible insurance" against such loss.

It is also clear that as between the companies themselves no determination of whether or not there is other valid and collectible insurance can be established without first deciding which company is primarily and which secondarily liable, for St. Paul says it will pay only the excess after the limits of the Oregon policy are exhausted, and Oregon says, since there is other insurance, it will pay only a proportionate share of the loss.

Thus, in such a situation, the court is faced with determining which company shall be considered primarily liable, or treating the "other insurance" clause in each insurer's policy as so repugnant that they must both be ignored, and apply the rule that the loss shall be equally prorated between them.

The trial court applied the rule of primary and secondary liability, following the general rule set out in 8 Appleman, Insurance Law and Practice 333, § 4914, that when it is determined who is the primary insurer "the courts give no application to the other insurance clause in the primary policy, which provides that if the additional insured has other valid and collectible insurance, he shall not be covered by the primary policy." The difficulty that is encountered by the courts, however, is not in applying this rule, but in finding sound reasoning upon which to base a determination of primary and secondary liability.

In *Michigan Alkali Co. v. Bankers Indemnity Ins. Co.*, 103 F2d 345 (2d Cir 1939), cited by plaintiffs, the

court determined one insurer to be the primary insurer and its policy given effect, and the clauses of the other insurer rejected on the basis that the selected primary insurer's policy was first issued. To the same effect may be cited: *New Amsterdam Cas. Co. v. Hartford Acc. & Indemnity Co.*, 108 F2d 653 (6th Cir 1940); *Kerns Coal Corp. v. U.S.F. & G.*, 118 F2d 33 (2d Cir 1941); *Gutner v. Switzerland Gen. Ins. Co. of Zurich*, 32 F2d 700 (2d Cir 1929). But many courts reject this "prior in time" theory: *Zurich General Accident & Liability Insurance Co. v. Clamor*, 124 F2d 717 (7th Cir 1941). See also *McFarland v. Chicago Express, Inc.*, 200 F2d 5 (7th Cir 1952). This for the reason that at the time of issuance there is only a possibility of liability under both policies and this liability only comes into being by reason of the same negligent act which makes each assumed risk effective at the same moment.

Also, courts have relied upon a rule that the policy which is interpreted to be the most specific in its terms or coverage or rejection of coverage is to be considered primary or secondary, *Grasberger v. Liebert and Obert*, 335 Pa 491, 6 A2d 925, 122 ALR 1201 (1939); *General Insurance Company v. Western Fire and Casualty Company*, 241 F2d 289 (5th Cir 1957); *Continental Casualty Co. v. Curtis Publishing Co.*, 94 F2d 710 (3 Cir 1938). But even under similar facts, as set forth in the above cases, the insurance carriers were held to be co-insurers and the loss prorated. *New Amsterdam Cas. Co. v. Hartford Accident & Ind. Co.*, 108 F2d 653 (6 Cir 1940).

The reasoning of these cases, however, is not applicable to the facts of this case, because the policy of each insurer specifically covers the operation of the particular truck, describing it in its policy, and the driver of the truck, through which liability arises,

is covered only by reason of the additional insured provisions of each policy, generally referred to as "omnibus" clauses.

However, in general, the fallacy of the reasoning of adopting this rule is apparent in the fact that the clear intent of each insurer in the policies is clearly expressed to cover the liability of the tort feasor, whether named or additional, and to escape all or partial liability if there is other insurance applicable to the same occurrence.

The courts have also, in seeking to discover which company under conflicting policy provisions, when involved on the same risk, should be primary and which secondary, resorted to applying a rule that, if a named insured is the primary tort feasor, the company so specifically naming him is primary and the other company secondary. *Fidelity & Cas. Ins. Co. v. Sears Roebuck & Co.*, 124 Conn 227, 199 A 93 (1938); *Commercial Cas. Ins. Co. v. Hartford Acc. & Ind. Co.*, 190 Minn 528, 252 NW 434, 253 NW 888, (1934); *Maryland Cas. Co. v. Bankers Ind. Ins. Co.*, 51 Ohio App 323, 200 NE 849 (1935); *American Auto Ins. Co. v. Penn Mutual Ind. Co.*, 161 F2d 62 (3rd Cir 1947).

This doctrine, of course, cannot be applied under the facts of this case, because the primary tort feasor, Cole, the driver of the truck, is not a named insured in either policy, and the coverage attaches in each policy only because of the other driver provisions. If, however, the underlying consideration for this doctrine should be applied to the facts of this case, then Cole, the driver, being at the time the agent of the plaintiff Lamb-Weston, Inc., lessor of the truck and the primary tort feasor, it would seem that St. Paul should be considered the primary insurer. Apart from the facts present, this approach to a determination of such an

issue, like all others, fails in logic for each policy does in fact intend to insure the driver of the truck, whether named or not, and thus the intent of both insuring companies is to insure the actual tort feasor under circumstances reasonably to be anticipated by both. It can, therefore, be considered only an arbitrary rule to reach a result. *Maryland Casualty Co. v. Employers Mutual Liability Ins. Co.,* 112 F Sup 272 (D.C. Conn 1953).

From an examination of the above-cited cases and others of similar import we believe none can be logically acceptable and it is our view that any attempt to give effect to the "other insurance" provision of one policy while rejecting it in another is like pursuing a will o' the wisp.

In 1952, the United States Circuit Court of Appeals for the 9th Circuit recognized the futility of a sound rule seeking to determine primary and secondary liability between different insurers covering the same risk, and in *Oregon Auto. Ins. Co. v. United States Fidelity & Guar. Co.,* 195 F2d 958, 595, the Court said:

> "We have examined cases in other jurisdictions cited by counsel where closely similar or substantially identical disputes between insurance companies have arisen. These decisions point in all directions. One group indicates that the policy using the word "excess" is secondary and that containing the language of the Oregon policy is primary. Examples of these decisions are cited on the margin. Their reasoning appears to us completely circular, depending, as it were, on which policy one happens to read first. Other cases seem to recognize the truth of the matter, namely, that the problem is little different from that involved in deciding which came first, the hen or the egg. See remark of Judge Major in Zurich General Accident & Liability Insurance Co. v. Clamor, 7 Cir., 124 F2d 717, 719. In this dilemma courts have seized upon

some relatively arbitrary circumstances to decide which insurer must assume primary responsibility. Thus one group of cases fixes primary liability on the policy which is prior in date. Another group undertakes to decide which policy is the more specific, holding the one thought more specific to be primary. Another solution is represented by Maryland Casualty Co. v. Bankers Indemnity Ins. Co., 51 Ohio App. 323, 200 N.E. 849, where it was held that the policy issued to the person primarily liable for the damage is the primary insurance. In sum, the cases are irreconcilable in respect both of approach and result."

Also, note *Gutner v. Switzerland General Ins. Co.,* 32 F2d 700 (2d Cir 1929); *New Amsterdam Cas. Co. v. Hartford Acc. & Ind. Co.,* 108 F2d 653 (6th Cir 1940).

As a result of these observations the Court determined each company should share proportionately in the loss. In that case, the policy of each insurer provided, in the event of other insurance, theirs should be treated as excess insurance and liability thereunder came into existence only after the limits of the other had been exhausted.

In 1954, the Supreme Court of Florida approved of and followed *Oregon Auto Insurance Co. v. United States Fidelity & Guaranty Company,* supra, (see *Continental Cas. Co. v. Weeks,* 74 So2d 367 (Fla), 46 ALR 2d 1159). In this case one policy provided there should be no liability and the other provided its liability should be treated as excess.

In 1958, the Supreme Court of the State of Missouri in *Arditi v. Massachusetts Bonding & Insurance Co.,* 315 SW2d 736, 743 (Mo), a case of first impression in that jurisdiction, where each insurance company contended its policy was excess and the other primary, the Court, speaking through Mr. Justice Hyde, said:

"* * * The parties agree that this question

has never been decided in Missouri and our conclusion is that we should follow the rule stated in Oregon Auto Ins. Co. v. United States Fidelity & Guaranty Co., 9 Cir., 195 F2d 958, 960, as follows: 'In our opinion the "other insurance" provisions of the two policies are indistinguishable in meaning and intent. One cannot rationally choose between them. We understand the parties to concede that where neither policy has an "other insurance" provision, the rule is to hold the two insurers liable to prorate in proportion to the amount of insurance provided by their respective policies. Here, where both policies carry like "other insurance" provisions, we think (they) must be held mutually repugnant and hence be disregarded.' "

In 1958, in *American Automobile Ins. Co. v. Seaboard Surety Co.,* 155 Cal App2d 192, 318 P2d 84, 86, in speaking of the reciprocal rights and duties of several insurance companies, each with "other insurance" policy provisions covering the same occurrence, the Court said:

"* * *  their agreements are not with each other. See Offer v. Superior Court, 194 Cal 114, 118, 228 P. 11; Fireman's Fund Ins. Co. v. Palatine Ins. Co., 150 Cal. 252, 256, 88 P. 907. Their respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. As these principles do not stem from agreement between the insurers their application is not controlled by the language of their contracts with the respective policy holders. The Minnesota Supreme Court, dealing with policies covering two insured persons whose liability for an accident was primary and secondary between themselves, said in Commercial Casualty Ins. Co. v. Hartford Accident & Indemnity Co., 190 Minn. 528, 252 N.W. 434, 435, 253 N.W. 888: 'The two contracts of insurance and their interpretation must be the factual basis of decision. But there was no contract and so no contractual relation be-

tween the insurers. Neither was beneficiary of the other's contract. Neither having any contract right against the other, but both being under contractual obligations in respect to the same risk, it remains only to determine the respective equities. If they are concurrently liable for the same risk, it is but obvious equity that there should be contribution. * * *,"

After determining that each insurer should contribute to the loss, the Court referred to the fact that one policy provided it would contribute prorata and the other that its liability should be only excess, as follows, p. 88-89:

"* * * The American provision renders it liable for its prorata portion of the loss, in this case one-half, and the insured after paying can collect that much and no more from that insurer. It was so held in Fidelity & Cas. Co. of New York v. Fireman's F. I. Co., 38 Cal. App.2d 1, 5, 100 P2d 364. Hence the policy is to that extent 'good, valid and collectible' other insurance within the purview of the Seaboard policy, which in that event protects the insured with excess insurance 'over and above the amount of any such other good, valid and collectible insurance',—namely, to the extent of one-half of the total loss. This same result was reached, through imposing overriding equitable principles, upon consideration of conflicting prorate and excess clauses in Air Transport Mfg. Co. v. Employers' Liab. Assur. Corp., 91 Cal. App.2d 129, 204 P.2d 647; Peerless Cas. Co. v. Continental Cas. Co., 144 Cal. App.2d 617, 619-623, 301 P.2d 602; and Canadian Indem. Co. v. Ohio Farmers Indem. Co., D.C.N.D. Cal., 140 F. Supp. 437, 439."

In 1959, the case of *Cosmopolitan Mut. Ins. Co. v. Continental Cas. Co.*, 28 NJ 554, 147 A2d 529, the Cosmopolitan Mutual Insurance Company had insured the Essex County News Company against liability for personal injury and property damage. Coverage

was upon owned and non-owned or hired motor vehicles, but as to hired motor vehicles the policy provided as follows:

> "* * * provided, however, the insurance under this policy with respect to loss arising out of the maintenance or use of any hired automobile insured on a cost of hire basis or the use of any non-owned automobile shall be excess insurance over any other valid and collectible insurance."

The Essex County News Company hired a truck from the U-Drive It Company, which carried insurance with the Continental Casualty Company insuring the lessee and his driver from liability for personal injuries and property damage while operating the truck. This policy as to other insurance made the following provision:

> "The insurance under this policy shall be excess insurance over any other valid and collectible insurance available to the insured, either as an insured under another policy or otherwise."

The Supreme Court of New Jersey, after considering "the varied and irreconcilable tests for determining which policy is primary and which secondary" rejected them all and determined that the loss should be borne prorata equally between the parties.

Also, in 1959, in *Woodrich Construction Co. v. Indemnity Ins. Co.*, 252 Minn 86, 89 NW2d 412, 420, a case wherein four companies were involved as insurers of the same risk, the Supreme Court of the State of Minnesota, citing *Oregon Auto. Ins. Co. v. U.S.F. & G. Co.*, supra, with approval, said:

> "The application of rules of construction based upon some relatively arbitrary circumstance—such as holding the insurer of the primary tort-feasor primarily liable; holding the specific insurer liable to the exclusion of the more general insurer; or

fixing primary liability upon the insurer first issuing its policy in point of time—brings about a circuity of reasoning and inequitable and confusing results which have little relation to contractual intent or regard for the contractual rights of the parties. In determining the respective liabilities of insurance coverage in cases of overlapping coverage, the decision must rest upon a construction of the language employed by the respective insurers and not upon any so-called primary-tort feasor doctrine or upon any other arbitrary rule or circumstance. Any language in any of our decisions subject to a contrary interpretation is expressly overruled."

The Court then determined that each insuring company should be liable prorata.

In *Beattie v. American Automobile Ins. Co.,* Mass 156 NE2d 49, argued January 6, 1959, and decided February, 1959, we find the Massachusetts Supreme Court dealing with issues which for all intents and purposes are identical with the case at bar. A trucking company leased a truck to Mortons, Inc. Mortons' agent while operating the truck injured Beattie. The trucking company had in effect a policy covering bodily injury and property damage which under its "insured" clause included "the named insured and * * * any other person responsible for the operation of the * * * vehicle with the * * * consent of the named insured" and as to other insurance provided "if the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss." Mortons, Inc. had in effect a policy of insurance which regarding bodily

injury and property damage covered the liability required by Massachusetts law of "any person responsible for the operation of insured's motor vehicle with his express or implied consent." And as to other insurance, its policy should be "excess insurance over any other valid and collectible insurance available to the insured either to said motor vehicle or otherwise." While this opinion does not discuss the problems involved in adjusting liabilities under other insurance clauses in overlapping coverages, it cites 38 Minn Law Review 838, 856, 21 ALR2d 611, 31 ALR2d 1324, 46 ALR2d 1163, and *Cosmopolitan Mutual Ins. Co. v. Cont. Cas. Co.*, 28 NJ 554, 147 A2d 529, supra, (See, also, 52 Columbia Law Review 1063) and then determines that each company shall pay its proportionate share.

We are of the opinion that in these later cases the courts have placed this problem in its true perspective by recognizing the absurdity of attempting to assume that where conflicting "other insurance" provisions exist by reason of overlapping coverages of the same occurrence the provisions of one policy must yield to the provisions of the other.

It may be contended with some slight basis in reason, since the Oregon clause provides for prorating in proportion to the amount of valid insurance then in effect, its liability should be limited in that proportion. Thus, it would pay its prorata share upon that basis as "other valid and collectible insurance" and St. Paul would pay the balance under its excess clause. In this manner some effect is given to the "other insurance" clause of each policy.

Such a contention leads, however, to a return to the circular reasoning necessary to establish primary and secondary liability, for to sustain this contention such proration can only be given effect by determining

the company carrying such "other insurance" clause is a primary insurer with limited liability.

Of course, no difficulty is encountered in reaching a just result under such reasoning if the prorata clause in a policy expresses equal liability with that of another insurer, and, while such a result may be just, we do not believe it can be sustained upon sound reasoning.

■ The "other insurance" clauses of all policies are but methods used by insurers to limit their liability, whether using language that relieves them from all liability (usually referred to as an "escape clause") or that used by St. Paul (usually referred to as an "excess clause") or that used by Oregon (usually referred to as a "prorata clause"). In our opinion, whether one policy uses one clause or another, when any come in conflict with the "other insurance" clause of another insurer, regardless of the nature of the clause, they are in fact repugnant and each should be rejected in toto. See Minnesota Law Review, supra.

■ The trial court having erred in its conclusion of law that defendant as a primary insurer was, under its policy, liable for the full amount of the loss, the case is remanded with instructions to modify its finding to conform with the law as set forth in this opinion and to enter judgment for the plaintiffs and against the defendant for only one-half of the loss liability, together with plaintiffs' costs and disbursements.

The decree of the circuit court is affirmed as modified.

## ON REHEARING

PETITION FOR REHEARING

Helm & Neely, La Grande, Minnick & Hahner and James B. Mitchell, Walla Walla, Washington, and Rhoten, Rhoten & Speerstra, Salem, for the respondents.

Fabre, Collins & Kottkamp, Pendleton, for the appellant.

PERRY, J.

The plaintiffs have petitioned this court for a rehearing solely upon that portion of our decision that states the loss as between the plaintiff and defendant insurance companies should be borne equally.

■ It is the position of the plaintiff St. Paul Fire and Marine Insurance Company that since its applicable limit was $25,000 for property damage and the defendant's limit was $5,000, the loss should be prorated between them in proportion to these applicable limits of liability. For example, in this case the plaintiff insurance company would pay 5/6th and the defendant 1/6th of the loss.

The plaintiff company properly states that this position taken is against its monetary interest in this case, but that in general the courts under similar situations have followed a rule of prorating the losses on the basis of the limits of liability of each company; that this rule has been followed and relied upon generally in the insurance industry and should not be changed.

The defendant's brief submitted upon the petition for a rehearing also urges this position.

Independent of the briefs submitted, our limited research discloses that the law of apportionment is of very ancient origin. In the second book of the Bible, revised standard version, Exodus, ch 21, para 35, it is said:

> "When one man's ox hurts another's, so that it dies, then they shall sell the live ox and divide the price of it; and the dead beast also they shall divide. Or if it is known that the ox has been accustomed to gore in the past, and its owner has not kept it in, he shall pay ox for ox, and the dead beast shall be his."

Similar rules were recognized by the most ancient civilizations. 3 Select Essays in Anglo-American Legal History, Assoc. American Law Schools, 101.

The first appearance in Anglo-American law of the principles of pro rata contribution seems to be under

the heading of Admiralty, where the principles of general average have been used for at least 500 years. Hopkins, Average and Arbitration, 4th ed, p 6. In cases where one merchant's goods were jettisoned or destroyed on a sea voyage for the purpose of saving the rest of the venture from imminent peril, the loss was borne by all interests in proportion to the value of their goods which were saved. Hopkins, supra, p 47. The pro rata contribution which was applied in these cases can easily be justified on an unjust enrichment basis, since each owner was required to make a contribution which was proportional to the benefit which he received.

It is generally believed that in England the contract of insurance was first used in underwriting marine risks, since insurance was introduced by maritime traders from the Italian cities. 3 Select Essays in Anglo-American Legal History, Assoc. American Law Schools, 107. All early insurance disputes were settled by merchant courts, or arbitrators. For example, in the record of the proceedings before Admiralty prior to 1570 there is a petition by the owner of insured goods asking that arbitrators be appointed and the underwriters made to pay, " 'forasmuche as your said rater hath noe remedye by the ordre and course of the common lawes of the realme, and that the ordre of insurance is not grounded upon the lawes of the realme, but rather a civill and maritime cause to be determined and decided by civilians or else in the highe courte of Amiraltye.' " 3 Select Essays in Anglo-American Legal History, supra, 111. Since insurance disputes were settled by marine traders in their merchant courts, it seems likely that they imported the law of general average into the law of marine insurance. If one merchant should be compelled to contribute to another because his wares were saved through the

sacrifice of the second merchant's goods, it would seem equally logical that one insurance company which had its risk saved through the abandonment of goods insured by another, should be compelled to share the loss according to the relative value of the goods preserved. This later became the law. 11 Arnould, Marine Insurance and Average, 12th ed., 1224.

■ There is, however, an even more direct connection between the law of general average and land insurance. This link is the case of *Deering v. The Earl of Winchelsea,* 126 Eng Rep 1276 (1787), 2 Bos & Pul 270. In 1778, Thomas Deering was appointed receiver of fines and forfeitures of the customs of the out ports. Sir Edward Deering and the two defendants entered into three separate bonds of 4,000 pounds each to assure that Thomas Deering would duly account for funds received. Thomas lost the King's money while gaming and left the realm. His accounts were short nearly 4,000 pounds. Judgment was obtained against Sir Edward for this amount. Thereupon Sir Edward brought a suit against the other two sureties for contribution on their separate bonds. They argued that as the bonds were separate, they were under no contractual obligation to reimburse Sir Edward. They also asserted it was Edward who had led Thomas into his evil habits and that Edward could not recover on that account. To the defendant's first contention the court replied, pages 1277 and 1278:

"* * * the bottom of contribution is a fixed principle of justice, and is not founded in contract * * *.

* * * * *

"There is an instance in the civil law of average, where part of a cargo is thrown overboard to save the vessel, Show. Parl. Cas. 19 Moor, 297. The maxim applied is qui sentit commodum sentire

debet et onus. In the case of average there is no contract express or implied, nor any privity in an ordinary sense. This shews that contribution is founded on equality, and established by the law of all nations."

To the argument that Sir Edward did not have clean hands the court said, page 1277:

"* * * There might indeed be a case in which a person might be in a legal sense the author of the loss, and therefore not entitled to contribution; as if a person on board a ship was to bore a hole in the ship, and in consequence of the distress occasioned by this act it became necessary to throw overboard his goods to save the ship * * *."

Apparently, the court applied principles derived from the law of general average in this case which closely approximates the present controversy. However, it is here submitted that the case of *Deering v. Earl of Winchelsea,* supra, was not directly analagous to the average cases. In the insurance cases involving general average, there are two insurers and two separate risks. A sacrifice of one risk saves the other. If there is no contribution, the one whose risk is saved is enriched at the expense of the one whose goods were jettisoned. But in the Deering case, as in the present case, there was only one risk which was concurrently covered by separate insurers. Any right to contribution must be established on the basis of such equitable maxims as "Equity is equality," etc. As the court said in the Deering case, supra, "the bottom of contribution is a fixed principle of justice." Considering the case on that basis it is no doubt sound. Three sureties received what was presumably an equal fee to secure separately one risk. In case of a loss, it seems reasonable that they should contribute in proportion to the benefit each had received from the contract, i.e., the premium. Although the Deering case and the general

average cases may not be as closely akin as the court indicated in its opinion, there runs through them both this controlling principle: when there is a loss which should be shared, the respective shares will be determined by considering the benefits which accrued to the contributors. With the general average cases, the benefit is the value of the goods saved. With a surety contract, the benefit is the premium paid.

Fifty-eight years later Chief Justice Shaw of Massachusetts was faced with a case which concerned double marine insurance. In *Wiggins v. The Suffolk Insurance Company*, 35 Mass 145, 153 (1836), he said:

> "Treating these policies then as in fact made at the same time, the clause in regard to priority is wholly inoperative, and then as to the amount of the difference between the sum insured and the sum at risk, it is the case of a double assurance, that is, the assured has an obligation from two or more parties to perform the same thing, at the same time. When this is the case, the party holding such double assurance, may in the outset, and before making any election, consider each debtor as liable for a proportionate part of the common burden, and recover accordingly; or he may require either of the parties liable, to pay the whole, and then it follows as a rule of law, founded upon the broadest principles of equity, that where one of two parties has paid the whole of a debt, for which each was originally and ultimately liable, the party who has paid the whole or a disproportionate part of the common debt, shall have a remedy against the other for a contribution, so that the burden may be borne equally according to their respective liabilities."

If, in this case, the risk borne by each was directly related to the benefit, or premium received, it would seem that this case is as sound as the Deering case, supra. Both policies were for the same amount, so the premiums were probably equal.

*Giles v. Royal Ins. Co.*, 179 Mass 261, 266, 60 NE 786 (1901), was a case in which the plaintiff sought to enforce an arbitration decree against several fire insurance companies. Commenting on the joinder of the several insurance companies, Chief Justice Holmes said:

> "* * * It is evident that the joinder of parties was with an intelligent design which we see no reason for not carrying out. It is true that the claims against different insurance companies are distinct. But if all the policies are on the same risk it is at least convenient, and may be important, that all the companies should be represented in any adjustment that takes place. *Their burdens may have to be equalized in one way or another.* Wiggin v. Suffolk Ins. Co., 18 Pick 145, 153. * * *" (Italics ours)

Mr. Justice Holmes' reference to page 153 of the Wiggins case, supra, contains the quote from Chief Justice Shaw set forth above. It is evident that Justice Holmes considered the principle of the marine insurance case broad enough to embrace a fire insurance case. Fire insurance rates are quoted as the number of cents per annum per hundred dollars insurance, so the premium varies directly with the limits of the policy. Patterson, Cases on Insurance, 3rd ed, p 785. Thus Justice Holmes' statement is consistent with the Deering case, supra, and the Giles case, supra. Again the burden in a pro rata distribution will be directly related to the benefit received. For another case which holds that two fire insurance companies should bear a loss in the proportion that the limits of their respective policies bear to the total insurance, see *Home Ins. Co. v. Baltimore Warehouse Co.*, 93 US 527, 23 L Ed 868 (1876).

*Celina Mutual v. Citizens Casualty*, 194 Md 236, 241, 71 A2d 20, 21 ALR2d 605, (1950), is urged as authority for the proposition that automobile liability

insurance should be prorated in the same manner as fire insurance. The case is easily distinguishable on its facts, since both insurance policies there involved contained pro rata provisions. However, much language in the decision does point to the result urged by the companies:

> "There appears to be no very direct authority on the exact question. The general rule as to insurance policies is that where there are *pro rata* or proportionate clauses in several insurance policies insuring the same property, the insurance is concurrent and each insurer is liable for its proportionate amount. *This has also been held to be the rule where there is no provision about proportionate insurance in either policy.* Richards on Insurance, 4th Ed., Page 455, Section 272, Joyce, Law of Insurance, 2nd Ed., Vol. 4, Sections 4911-4914, both inclusive. Hough v. President etc., of Peoples Fire Insurance Co., 36 Md. 398; Fire Insurance Ass'n v. Merchants' and Miners' Transportation Co., 66 Md. 339, 7 A. 905; 59 Am. Rep. 162; Hanover Fire Ins. Co. of City of New York v. Brown, 77 Md. 64, 25 A. 989, 27 A. 314, 39 Am. St. Rep. 386; Liberty Mutual Insurance Co. v. United States Fidelity and Guaranty Co., 164 Md. 117, 164 A. 179; Home Insurance Co. v. Baltimore Warehouse Co., 93 U.S. 527, 23 L. Ed. 868; American Lumbermen's Mutual Casualty Co. v. Lumber Mutual Casualty Ins. Co., 251 App. Div. 231, 295 N.Y.S. 321."

As seen above, in the case of fire insurance, when a loss is prorated in the ratio which the limits of the policies bear to the total coverage, the burden imposed on each insurer is generally proportional to the benefit which he received, since the size of the premium is most always directly related to the size of the policy.

While distinction can be made between insurance underwriting practices in the field of fire insurance and automobile liability, it would seem that they are

not sufficiently important to disturb the rule of proration sought by the companies in this case.

Our former opinion is modified to this extent only: that the plaintiffs' have judgment against the defendant for one-sixth of the ascertained liability.

Petition for rehearing denied.