Argued December 3, 1963, affirmed April 22, petition for
rehearing denied June 16, 1964

# GENERAL INSURANCE COMPANY, and MOORE TIMBER PRODUCTS, INC. *v.* SASKATCHEWAN GOVERNMENT INSURANCE OFFICE and BRITISH COMMERCIAL INSURANCE COMPANY ET AL

391 P. 2d 616

*Howard K. Beebe,* Portland, argued the cause for appellants. With him on the briefs were Winfrid K. Liepe and Maguire, Shields, Morrison, Bailey & Kester, Portland.

*Stephen E. Parker,* Portland, argued the cause for respondent cross-appellant Saskatchewan Government Insurance Office. With him on the brief were Parker & Duffy, Portland.

*R. Gene Smith,* Grants Pass, argued the cause for respondent cross-appellant General Insurance Com-

pany and respondent Moore Timber Products, Inc. With him on the briefs was Gene L. Brown, Grants Pass.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and DENECKE, Justices.

DENECKE, J.

The interpretation of various provisions of liability insurance policies is the problem in this appeal.

The plaintiff General Insurance Company issued a general liability policy to the plaintiff Moore Timber Products, Inc. The defendant Saskatchewan Government Insurance Office issued an automobile liability policy to Timber Haulers, Inc. The remaining defendants had excess automobile liability coverage on Timber Haulers, Inc.

Timber Haulers had a contract with Moore to haul logs from Moore's sawmill to a plywood plant. In the performance of this contract an employee of Timber Haulers, Herschel Hon, drove Timber Haulers' truck onto the mill site. Moore's employees then proceeded to load logs onto this truck. After Moore's employees had finished placing the logs on the truck, Hon started to fasten the binder chains around the logs to secure the load. As he was so doing, a log slipped off the truck, killing Hon. In a wrongful death action a jury determined that Hon's death was caused by Moore's negligence in loading the logs on the truck. *Hon v. Moore Timber Products, Inc.*, 215 Or 628, 337 P2d 321 (1959), affirmed the judgment awarding Hon's widow damages against Moore.

General paid this judgment for damages under its

general liability policy and by this proceeding, as a subrogee to Moore's rights, seeks to recover from Timber Haulers' automobile liability insurers all or part of the amount so paid, and also the amount expended in defending the death action. General's contention is that Moore was an omnibus insured of Timber Haulers' policies and, therefore, that the companies issuing Timber Haulers' policies should have paid the judgment against Moore.

Saskatchewan's automobile liability policy provides:

"I. Coverage A—BODILY INJURY LIABILITY: To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of the automobile.

"* * * * *

"* * * Use of the automobile for the purposes stated includes the loading and unloading thereof.

"* * * * *

"III. DEFINITION OF INSURED: With respect to the insurance for bodily injury liability and for property damage liability the unqualified word 'insured' includes the named insured and also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission. * * *"

The above-quoted provisions provide that a person using Timber Haulers' truck with its permission is insured by Saskatchewan and that the "loading and unloading" of the truck is considered "using" the truck.

Therefore, the issue is whether Moore was "using" the truck, i.e., was Moore "loading" the truck when the accident occurred. The trial court specifically found: "The death of Herschel Hon occurred during the process of loading the truck of Timber Haulers, Inc. * * *" and held for General.

The facts concerning the loading are not in dispute. Moore's duty was to pick out the logs to be loaded and to put the logs onto the truck. The truck driver was to check the load for width, height and weight. At the driver's request Moore would shift or change logs to suit the driver. This procedure was followed at the time Hon was killed. Hon asked that the last log placed be shifted; it was, and Hon then assured the loader that everything was "just right." The loader stepped off the truck and Moore did nothing further about placing or shifting the logs. However, a Timber Haulers' employee at Moore's request continued to scale the loaded logs. Hon checked the scales and then proceeded to put his binder chains around the logs, and he was so doing when a log fell off the load, killing him. From three to ten minutes elapsed between the time the last log was shifted into its final position and the time it fell.

At the time the log fell, Mr. Turner, Timber Haulers' truck foreman, was on the load scaling the top two logs. There is no evidence or contention that scaling caused the log to fall. The testimony was that Moore's woods superintendent, Arthur Kellert, scaled the three bottom logs on the truck sometime after they were loaded and prior to the placement of the two top logs. Moore's superintendent had a broken thumb and had asked Turner if he would scale the top two logs for him. There was no evidence why Moore was scal-

ing the logs. We know, however, that scaling is frequently performed when logs are being loaded.

Reliance on scaling as "loading" is probably a change in emphasis by General from its position in the trial court. However, it is not precluded from making such a contention. General's complaint alleges that Moore was "using" the truck; scaling, as an incident of loading, could be considered "using." The trial court does not mention scaling in its memorandum opinion but states other conduct constituted loading. However, it made formal findings and therein generally found that Moore was loading at the time of Hon's death and did not specify any particular conduct as constituting loading.

The defendants contend that the scaling had no connection with the loading because there was no evidence why Moore did the scaling or that Moore had ever scaled any other load. It is immaterial why Moore scaled or whether Moore had similarly scaled before. The vital fact is that, on this particular occasion, Moore saw fit to scale the logs while in the process of placing them upon the truck. The connection between placing the logs and scaling the logs was not coincidental; loading facilitates scaling; the loading was geared to the scaling. The top logs were not placed until Moore had scaled the logs forming the bottom layer. The scaling was, in this case, measuring the quantity loaded.[1]

[1] It would be of no lasting consequence for us to indicate our acceptance or rejection of either of the two tests for defining the scope of "loading and unloading," the "complete operation" or "coming to rest" tests. The "loading and unloading" provision of the policies of a majority of the insurance companies, written after December 1, 1963, is substantially different from the provision in Saskatchewan's policy and from the often-interpreted provision contained in most of the policies written prior to December, 1963. Suter, *Loading and Unloading*, 31 Ins Counsel J 112 (Jan 1964).

■■ Defendants contend Moore was not using or loading the truck at the time of Turner's scaling because Turner was an employee of Timber Haulers and was scaling merely as an "accommodation" for Moore. Turner was not compensated for his scaling; however, one can be a servant even though the service is performed gratuitously. *Butenshon v. Shoesmith,* 191 Or 76, 83, 228 P2d 426 (1951). Turner's being a general employee of Timber Haulers does not prevent him from being a servant of Moore during the time he is doing the particular act requested by Moore. Restatement (Second) 503, Agency § 227, Comment *d.*

■ We hold that the scaling constituted part of the loading of the truck by Moore. This was in progress at the time Hon was killed; therefore, Moore was an omnibus insured at the time liability against Moore accrued. It is immaterial that Moore's loading (scaling) at this time was not a cause of Hon's death. Hon's death was caused by Moore's negligent placement of the logs; therefore, Moore was an omnibus insured at the time of the negligent act. For these reasons Saskatchewan is held to be an insurer of Moore covering its liability arising by reason of Hon's death.

■ Saskatchewan also contends that because of a clause excluding injury or death of an *employee,* it does not cover Moore's liability to Hon's widow because Hon was an employee of Moore. In *Cimarron Ins. Co. v. Travelers Ins. Co.,* 224 Or 57, 355 P2d 742 (1960), we held that the employee exclusion clause only applies to an employee of the insured invoking the policy, in this case, Moore, the omnibus insured. Hon was Timber Haulers' employee. We adhere to the principle of that decision. See Suter, *Loading and Unloading,* 31 Ins Counsel J 112, 123-125 (Jan 1964), dis-

cussing the currents and countercurrents of judicial thought on this subject.

The next question is the respective liabilities of the parties. The limit of General's liability is $50,000, Saskatchewan's, $5,000, first excess policy's $10,000, and the second excess policy's $35,000.

General's "other insurance" provision is of the excess type.[8] Saskatchewan has a pro rata type of "other insurance" clause.[9] The excess carriers, by reference, adopt Saskatchewan's "other insurance" provision.

The trial court concluded that, under our decision of *Lamb-Weston v. Ore. Auto. Ins. Co.*, 219 Or 110, 341 P2d 110, 346 P2d 643, 76 ALR2d 485 (1959), the amount of the judgment against Moore, $42,291.52, should be prorated among the covering carriers in the

---

[8] "OTHER INSURANCE. If at the time of an occurrence there is any other insurance available to the insured (in this or any other carrier) there shall be no insurance afforded hereunder as respects such occurrence except that if the applicable limit of liability of this policy is in excess of the applicable limit provided by the other insurance available to the insured this policy shall afford excess insurance over and above such other insurance in an amount sufficient to afford the insured a combined limit of liability equal to the applicable limit of liability afforded by this policy. It is further provided that with respect to loss arising out of the operation, maintenance or use of any non-owned automobile the applicable insurance afforded by this policy shall be excess over and above such other available insurance. Insurance under this policy shall not be construed to be concurrent or contributing with any other insurance which is available to the insured."

[9] "OTHER INSURANCE—Coverages A and B: If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance with respect to temporary substitute automobiles under Insuring Agreement IV shall be excess insurance over any other valid and collectible insurance available to the insured, either as an insured under a policy applicable with respect to said automobiles or otherwise."

proportion that the amount of the coverage of each bore to the total amount of insurance coverage. In computing the total amount of insurance coverage the liability limits of all insurers, including the excess carriers, were included. This computation resulted in a finding that there was $100,000 coverage. General, with $50,000 of coverage, was found liable for 50/100ths of the amount of the judgment, Saskatchewan for 5/100ths, the first layer of excess for 10/100ths and the second layer of excess for 35/100ths.

The excess carriers maintain that this proration is in error upon the ground that they have no liability under their policies until the $5,000 coverage of the primary insurer, Saskatchewan, is exhausted. Under the trial court's formula, Saskatchewan was assessed only $2,114.59.

The first excess insurance contract provides as follows:

"Provided always that it is expressly agreed that liability shall attach to Underwriters only after the Primary Insurers [Saskatchewan] have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:

"(a) BODILY INJURY

"$5,000.00 ultimate net loss in respect of each person and, subject to the same limit each person,

"*  *  *  *  *

(all hereinafter referred to as the 'Primary Limit or Limits') ; and the Underwriters shall then be liable to pay only such additional amounts as will provide the Assured with a total coverage under the policy/ies of the Primary Insurers and this Certificate combined of

"(a) BODILY INJURY

"$15,000.00 ultimate net loss in respect of each person and, subject to the same limit each person,

"* * * * *

## "DEFINITIONS

"* * * * *

"2. ULTIMATE NET LOSS. The words 'ultimate net loss' shall be understood to mean the sums paid in settlement of losses for which the Assured is liable after making deductions for all recoveries, salvages and other insurances (other than recoveries under the policy/ies of the Primary Insurers), whether recoverable or not, and shall exclude all expenses and 'costs,'

"* * * * *

## "CONDITIONS

"* * * * *

"3. ATTACHMENT OF LIABILITY. Liability under this Certificate shall not attach unless and until the Primary Insurers shall have admitted liability for the Primary Limit or Limits, or unless or until the Assured has by final judgment been adjudged to pay a sum which exceeds such Primary Limit or Limits."

The contract of insurance for the second layer of excess is the same as that quoted above except that it provides:

"* * * that liability shall attach to the Underwriters only after the Primary Insurers [Saskatchewan and first excess] have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows:

"(a) BODILY INJURY

"$15,000.00 * * * and the underwriters shall then be liable to pay only such additional amounts as will provide the Assured with a total

coverage under the policy/ies of the Primary Insurers and this Policy combined of
"(a) BODILY INJURY
"$50,000.00 * * *.''

If Timber Haulers had only one automobile liability insurance policy with the same amount of total coverage as it now has, $50,000, the automobile liability insurance carrier's pro rata liability would have been 50/100ths. The question is,—should the same formula be applied when Timber Haulers has $5,000 primary coverage, and the balance of its total coverage, $45,000, is in the form of two layers of excess insurance?

We believe the intent of the excess insurance contract is clear and unambiguous,—no liability is to accrue unless and until the primary carrier is obliged to pay the limit of its liability after all means of reducing its loss, such as salvage, contribution from other applicable insurance, etc., have been utilized. By defining "ultimate net loss" as net loss after credit for the benefits of other available insurance, it is clear the excess carriers are endeavoring to put the loss on other carriers before excess has any liability. If the terms of the excess insurance contract are controlling, the excess carriers have no liability. Are they controlling? The answer lies in the rationale of *Lamb-Weston*.

In *Lamb-Weston* the controversy was between the named insured, St. Paul, and the omnibus insured, Oregon Auto. St. Paul had an excess "other insurance" clause and Oregon Auto a pro rata clause. We determined that any attempt to classify one policy as primary and the other as secondary, and thus reconcile the clauses, is an exercise in "circular reasoning." We

determined that if the provisions of one policy were not to yield to the other it was impossible to apply both equally; one could not, at the same time, prorate the liability of Oregon Auto and assess St. Paul only for the excess over Oregon Auto's liability.

We solved this dilemma by declaring the "other insurance" clauses repugnant to each other and, therefore, to be rejected and not considered part of either insurance contract. With these clauses ignored, the liability of each company was prorated by the proportion that each bore to the total limit of liability.

The basic holding of *Lamb-Weston* is that repugnant policy provisions will be erased from the contracts and ignored in construing the "other insurance" provisions of contracts. The precursor of our decisions was *Oregon Auto Ins. Co. v. United States Fidelity & Guar. Co.*, 195 F2d 958 (9th Cir 1952). That case held "other insurance" clauses to be mutually repugnant and, therefore, to be disregarded.

In this case, if we assume that the Saskatchewan policy covers Moore, none of the parties question the trial court's decision that, based upon *Lamb-Weston*, the "other insurance" clauses of General and Saskatchewan are repugnant; they should therefore be disregarded and a proration of some sort made. The question remaining is whether the provisions of the excess insurance contracts are reconcilable with General's "other insurance" clause or are they so inconsistent as to be repugnant.

The principle that repugnant clauses of a contract will be rejected is taken from the general rules covering the construction of contracts. As the excess carriers point out, we stated in *Lachmund v. Lope Sing,* 54 Or 106, 111, 102 P 598 (1909):

> "The rule that rejects a repugnant clause of a

contract is an expedient to which a court will very reluctantly, in any case, have recourse, and never unless absolutely compelled to do so. * * *"

However, this principle and its narrow limits were developed in construing clauses in the same contract drafted by the same parties, and ostensibly, with the same intent. Obviously, courts should be reluctant to conclude that two parties, in the same document, have agreed upon two conflicting provisions. The conflict suggests an error in draftsmanship or a failure to agree.

Here, and in *Lamb-Weston,* we have two contracts, entered into by two different sets of parties, and with two completely different purposes. The purpose of General in its "other insurance" clause is to limit General's liability. The purpose of the excess carriers in their statement of when their liability accrues is to limit the excess carrier's liability. Repugnancy or inconsistency in such clauses does not create an inference of faulty draftsmanship or a failure to come to a meeting of the minds. Rather, repugnancy is created because each is independently attempting to limit its liability because of the existence of the other's insurance.

General has provided in its policy that if there is other insurance either its insurance does not cover, or, if the other insurance is less than $50,000 (General's limit), General's coverage will be excess over the other insurance to the extent that the insured will have a total of $50,000. The excess carriers have provided in their contracts that they have no liability until or unless the primary carrier (Saskatchewan) has been required to pay the entire amount of its policy, after taking all credit for all other insurance. If the present

facts are examined in light of General's contract alone, General has no liability under its policy because there is other insurance available. If the facts are examined with only the excess carriers contract in mind, the excess carriers have no liability, because the primary insurer's liability limits will not be paid because General is required to prorate.

■ The situation in this case, as between General and the excess carriers, is the same as that existing in *Lamb-Weston* between St. Paul and Oregon Auto. There, if the policy language of St. Paul had been applied, it would have had no coverage and all the liability would have been on Oregon Auto. If the policy language of Oregon Auto had applied, it would have had no coverage, and all the liability would have been on St. Paul. We solved that impasse in *Lamb-Weston* by rejecting the repugnant policy terms. In this case we use the same reasoning and reject the repugnant policy terms. In the case of the General policy this means a rejection of those words stating that the policy does not apply if there is other insurance available. In the case of the excess policies this means a rejection of those words imposing liability only when the primary insured, after having the advantage of other insurance, is nevertheless obligated to pay its limits.

In reaching this decision, we are extending in a sense the reasoning we adopted in *Lamb-Weston*. In that case the "other insurance" clauses were incidental to the main insuring agreement. There, each carrier's primary obligation was to pay sums for which the insured became obligated. In this case the excess carrier's basic insuring agreement is to pay sums for which the insured becomes obligated, but no such obligation is to arise unless and until the specific primary

insurer is required to pay a certain amount; i.e., the primary policy limit. We are rejecting as repugnant this basic condition to the excess carrier's liability. This is done in a context in which the primary insurer and the two excess insurers' limits would have been completely consumed had it not been for General's coverage.

■ This condition is the basic and crucial provision which makes this excess, rather than primary, coverage. However, this overriding importance is present only when the relationship of the primary and excess carrier alone is considered. Only the primary and the excess insurers were parties to the contract creating this basic condition. Therefore, if General, or any other insurer-stranger to the primary-excess agreement, is not present, the excess carrier is not obligated until the primary insurer has been obligated to the limit of its policy. However, when an insurer, stranger to the primary-excess agreement, also has coverage for the insured, the excess carrier's attempt to shift the loss onto the stranger by its definition of "ultimate net loss" rises to no higher contractual plane than the stranger's attempt to shift the loss to the excess carrier by its "other insurance" clause.

To reach a contrary result would be to reason that the primary-excess agreement was entitled to preferential consideration over the stranger-insurer's contract. Such reasoning we concluded in *Lamb-Weston* was "circular."

Our holding is in accord with *Gilkey v. Andrew Weir Insurance Company,* 291 F2d 132 (9th Cir 1961). The law of Oregon was applicable in that case, and the court reached its decision on the basis of *Lamb-*

*Weston.* Their reasoning was slightly different than ours. The court stated:

"Lloyd's did cover this particular liability. In effect, it was an adjunct to Colonial [the primary insurer]. Since it covered, and incorporated by reference the same 'other insurance' clause of Colonial, we see no reason why Lloyd's should be held wholly non-liable for a loss which it expressly covered." (291 F2d at 136)

The California court has decided the issue contrary to our solution and the solution reached in *Gilkey. Peerless Casualty Co. v. Continental Casualty Co.,* 144 Cal App2d 617, 301 P2d 602 (1956). The California decision was reached, however, because California had rejected the repugnancy reasoning of *Oregon Auto Ins. Co. v. United States Fidelity & Guar. Co.,* supra (195 F2d 958), and, therefore, of this court in *Lamb-Weston.* The California court instead chose to attempt to reconcile the seeming irreconcilable clauses. The California decision specifically recognized: "On the basis of the Oregon case prorating with other insurance exceeding the stated amount of primary insurance might well be defensible." *Peerless Casualty Co. v. Continental Casualty Co.,* supra (301 P2d at 608).

Affirmed.