210 So.2d 688

**STATE FARM MUTUAL AUTO. INS. CO.**

**v.**

**GENERAL MUTUAL INS. CO.**

**2 Div. 450.**

Supreme Court of Alabama.

May 13, 1968.

Rives, Peterson, Pettus & Conway, Birmingham, for appellant.

Lloyd & Dinning, Demopolis, for appellee.

214

PER CURIAM.

One insurer, under an automobile liability policy, appeals from a decree ordering appellant to share the loss equally with another insurer which, allegedly, had issued an automobile liability policy covering the same risk.

Appellant is State Farm Mutual Automobile Insurance Company, a corporation, sometimes referred to as State Farm. Appellee is General Mutual Insurance Company, a corporation, sometimes referred to as General.

General brought the instant suit seeking contribution from State Farm as co-insurer of E. S. Harris, III, who had been involved in an automobile accident. An action at law had been brought against Harris, III, and others, by the father of a child killed in the accident. General defended and settled the action against Harris, III. State Farm denied liability and General brought the instant suit. The trial court held State Farm liable to General for one-half of the amount expended by General in defending and settling the action against Harris, III.

On this appeal, State Farm makes two contentions:

First, State Farm says that, under the evidence, the court erred in holding that State Farm was liable at all to General.

Second, State Farm says that, even if State Farm be held liable as co-insurer of Harris, III, State Farm's share of the loss should not be one-half but should be that

proportion of the loss which is the ratio of State Farm's policy limit to the sum of the limits of both State Farm's policy and General's policy. Stated another way, State Farm says that because the limit of its liability is fixed by its policy at $5,000.00, and the limit of General's liability is fixed by its policy at $50,000.00, State Farm should bear 5/55, or 1/11, of the loss and General the other 10/11.

It is alleged in the bill that General had coverage by a "Commercial Cover-all Policy," in the amount of $50,000.00 on Poultry & Egg Company, a family partnership composed of E. S. Harris, Jr., Ella N. Harris, E. S. Harris, III, and Jean H. Brittian, all of whom were made parties defendant in the action at law brought by the father of the minor child who had been killed while riding in a Buick automobile, allegedly the property of the partnership. At the time of the accident, Harris, III was driving the Buick.

It further appears without dispute that, prior to the accident, the driver's license of E. S. Harris, III had been revoked for cause, and in order to get it restored, he had been insured by appellant as an assigned risk. This procedure is authorized by Act No. 704, § 35, Acts of 1951, Vol. II, page 1243, approved September 5, 1951 [Recompiled Code of 1958, Title 36, § 74 (76)].

The policy so issued pursuant to the assigned risk procedure carried a provision that the policy was an "OPERATOR'S POLICY." Attached to the policy was an endorsement, 6050 (1.8151), excluding coverage:

"to any automobile owned by or registered in the name of the named insured."

It appears further from the pleadings and undisputed facts that State Farm refused or failed on proper demand, to defend the suit brought by the father of the deceased child to recover damages from the partnership and the individual partners for the wrongful death of said child, and that General bore the brunt of said defense without any aid or help from State Farm.

It further appears without dispute that during the progress of the trial of said damage suit, the parties reached an agreement of settlement whereby General paid $7,000.00, plus court costs of $277.75, plus their attorneys' fees of $1,563.68, and E. S. Harris, III paid $250.00. The total expenditure for settlement amounted to $8,841.43, and was paid by General on November 23, 1960.

The court decreed that General recover from State Farm the sum of $5,060.09 as follows:

"One-half of the sum of $8,841.43 expended by the Complainant on November 23, 1960 for judgment, court costs and attorneys fees, said one-half amounting to $4,420.71; "Interest at six percent per annum on said sum of $4,420.71 from November 23, 1960 until the date hereof being $639.38."

The trial court, in its decree, made a finding of fact from the evidence that Buick "was owned by, and was legal property of, said Poultry & Egg Company, a family partnership composed of E. S. Harris, Jr., and his wife, daughter and son * * *."

A review of the admissible evidence pertaining to this ownership, which was heard orally before the trial judge, is substantially as follows:

W. J. Broderick, a witness called by respondent (State Farm), testified that he was an accountant employed by Poultry & Egg Company since May 1, 1951; that each partner had a drawing account to which was credited profits from the partnership operation and other items, and that the money so credited was available on the demand of such partner; that he was familiar with the procedure of the partnership in buying automobile license plates for the partner-

ship and individual automobiles of the partners; that the only records he had concerning the purchase of the license tag for the 1959 Buick "are in court, the bill of sale and the tag receipt." (The invoice was the only record concerning the sale that was introduced in evidence.) He further observed that, "The record I have here is the record which is kept for tax purposes and only the vehicles which the Company legally claimed as expense of the Company do I keep in this record." He said that the 1959 Buick does not appear on the record. Further, he said, "There would not have been any other vehicles purchased with partnership funds other than those appearing on that page." Also, he stated that his records do not "show that any advancement was made by the partnership for the purchase of an automobile by E. S. Harris, III and then charged against his drawing account in the manner you told us about." He also stated that the premiums on the various automobiles in the policy were paid and that applicable to the individuals was charged to the individuals; that he did not know that the Buick was carried in this particular manner. Further, he testified that $3,050.00 collision insurance collected on the damaged Buick was credited to Harris, III.

On cross-examination, witness testified that Harris, III used the Buick in collecting; that the bill of sale was to Poultry & Egg Company, and that the license tag therefor was issued to Poultry & Egg Company.

Egerton S. Harris, III, called by respondent State Farm as a witness, testified as follows: · That in 1959 he purchased a Buick from Leigh Buick in Tuscaloosa; that he "picked it out," and then talked to his father about the price; that his father suggested an amount less than the price made by Leigh. They agreed on a price, and as credit thereon he traded a 1956 Ford Fairlane; that this Ford was registered in his father's name; that "He bought the car for me when I think I was sixteen years old. * * * I saved some money

and my father was going to match every dollar I saved, and before I was sixteen I bought some Southern Airways stock, and I never did sell my stock, * * * and he bought my Ford with that and I'd saved about $1100.00 myself. * * * I worked in the summer. He told me everything I'd save, when I got 16 that he would match it and buy me a car"; and that he got the car when he was sixteen. Witness also stated that he kept the Ford at home where his mother and daddy each had a car.

With reference to the balance of the purchase price to be paid in cash for the Buick, witness stated that he had some money saved up and that he paid the difference. "My father and myself went to the bank and borrowed the money to pay the balance." Both signed a note at the bank. The bank issued a cashier's check payable to witness, which he delivered to Leigh Buick Company in payment on the car. Observing further, he said that the other $1,500.00, after payment of the check for $1,200.00, was money he kept at Poultry & Egg Company.

It further appears from the evidence that Leigh made out an invoice for the Buick to Poultry & Egg Company.

"Q. What was the occasion for that?

"A. Well, I don't know. I knew the Ford was made out to daddy, and daddy usually handles those things himself. He always has the last word on anything like that. I wasn't 21 years old then.

" *     *     *     *     *     *

"Q. Do you remember anything else about it?

"A. No."

Witness said that the license tag, which the bookkeeper purchased, was in the name of Poultry & Egg Company. He further said that he had the Buick for about two months and used it for his personal use whenever he went anywhere, and that about

the only time he used it on business was when he was collecting for Poultry & Egg Company. Sometimes, when he would be delivering chickens, the car was down there for others to use.

#### (CROSS-EXAMINATION)

"Q. And when you were out of town, you left the car at Poultry & Egg Company, and the other employees there used the car?

"A. Yes sir. I remember one time when I had been out of town, I come in and it wasn't there. I asked about it and they said they'd gone and taken some colored people in my car, and I asked my father about it, and he said it was a Company car and he could use it when it was needed. I'd always considered it my car for my own use.

"Q. Then your father advised you it was a Company car and any Company employee could use it?

"   *    *    *    *    *    *

"A. He said I was a part of Poultry & Egg Company and that they had a right to use it just like sister's.

"   *    *    *    *    *    *

"Q. I'll ask you if, as part of that (referring to a statement witness signed as to how the accident happened), you stated, 'Poultry & Egg Company has a 1959 Buick, two door, hard top that I use for both business and pleasure'? That is the statement you signed?

"A. Yes sir."

■ We have held that in an action for injuries to a plaintiff struck by defendant's automobile, admission that the license number on an automobile, at the time of the collision, was in the name of the defendant, raised a presumption that the defendant was the owner. Patterson v. Millican, 12 Ala.App. 324, 66 So. 914. See: Penti-

cost v. Massey, 201 Ala. 261, 77 So. 675. This presumption is rebuttable. Stanley v. Hayes, 276 Ala. 532, 165 So.2d 84(7).

In the case at bar, it was undisputed that the Buick automobile was, at the time of the alleged accident, registered for a license tag in the name of Poultry & Egg Company, thereby creating a rebuttable presumption that the partnership at the time was the owner of said automobile.

The invoice, made when the Buick was purchased, recites that it was sold to Poultry & Egg Company. The registration made when license plates were purchased shows the title in Poultry & Egg Company. There is evidence that the Buick was used in the business of Poultry & Egg Company. After the wreck, the Buick was sold by means of an invoice or bill of sale executed by Poultry & Egg Company.

The policy here is an operator's policy issued under the responsibility law. See Code 1940, Recompiled 1958, Title 36, § 74(62) (c). The statute defines "Owner," in one definition as "A person who holds the legal title of a motor vehicle * * *." § 74(42) (h), Title 36.

In the instant case, General sues as subrogee of its insured. The rights of General are the same as the rights of the insured. In effect, the issue as to whether State Farm is liable, is between insured, Harris, III, and State Farm.

■ State Farm selected the words "owned by" in its policy. If there be any ambiguity, the words must be construed against insurer, State Farm.

■ We are of opinion that the facts of this case support a finding that the legal title to the Buick was in Poultry & Egg Company, and that, whatever equitable rights Harris, III may have had in the Buick, he was not "a person who holds the legal title" to the Buick, and so was not the owner of it, and that it was not a vehicle "owned by" him as that term is used

in the responsibility act and in the policy. See United States Fire Ins. Co. v. Hodges, 275 Ala. 243, 246, 154 So.2d 3, 5, where this court said:

"Contracts of insurance are liberally construed in favor of the assured and, if doubtful, such contracts are construed against the insurer. Cherokee Life Ins. Co. v. Brannum, 203 Ala. 145, 82 So. 175; McKee v. Exchange Ins. Ass'n, 270 Ala. 518, 120 So.2d 690."

The decree is affirmed in holding that State Farm is due to share in the loss. Appellant's second contention requires us to decide what proportion of the $8,841.43 loss State Farm should pay.

■ General's policy contains the following provision:

"9. OTHER INSURANCE—No Insuring Agreement hereof shall apply to any loss if the Insured is, or would be but for the existence of such Insuring Agreement, insured against such loss under any other policy or policies, bond or bonds, except as respects any excess beyond the amount which would have been payable under any other such policy or policies, bond or bonds, had such Insuring Agreement not been effective."

As here pertinent, this provision recites:

"No Insuring Agreement hereof shall apply to any loss if the Insured is * * * insured against such loss under any other policy * * * except as respects any excess beyond the amount which would have been payable under any other such policy * * * had such Insuring Agreement not been effective."

As we understand it, this provision provides that General shall be liable only for the amount of loss in excess of the coverage provided by such other policy, in this case, State Farm's policy. This provision, we think, is an "excess insurance" clause. 7 Am.Jur.2d, pages 543, 544, Automobile Insurance, §§ 201, 202.

By Respondent's Exhibit 2, a paper signed and sworn to by Harris, III, dated January 26, 1959, he stated that he was required to file evidence of financial responsibility. He stated that the type of certificate was "Operator's."

Respondent's Exhibit 2 is headed:

"APPLICATION FOR LIABILITY INSURANCE UNDER AUTOMOBILE ASSIGNED RISK PLAN"

As we understand the record, State Farm's policy was issued to Harris, III on this application. The policy is dated February 3, 1959.

■ In the section of State Farm's policy headed: "CONDITIONS," the following provision appears:

"8. Other Insurance. If the insured has other insurance against liability or loss covered by this policy, the company under all coverages except coverages C and M, shall not be liable for a greater proportion of such liability or loss than the applicable limit of liability bears to the total applicable limit of liability of all collectible insurance against such liability or loss."

We are not concerned with Coverages C and M.

The quoted provision from State Farm's policy, as we understand it, is a "pro rata" clause. See 7 Am.Jur.2d supra.

The signatures of the Secretary and President of State Farm appear at the end of what may be called the body of the policy. Next after these signatures appears what is referred to by the parties as an endorsement, which is headed:

"OPERATOR'S POLICY"

The endorsement is dated "02–03–59," which is also the date of the policy. The endorsement also is signed by the Secretary and President of State Farm, and is countersigned by "C. H. Payne Authorized Rep-

resentative." In pertinent part, the endorsement recites:

"It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability and for Property Damage Liability applies subject to the following provisions:

"\* \* \* \* \* \*

"3. The insurance does not apply:

"(a) to any automobile owned by or registered in the name of the named insured;

"\* \* \* \* \* \*

"4. The insurance shall be excess insurance over any other valid and collectible insurance available to the named insured, either as an insured under a policy applicable with respect to the automobile or otherwise, against a loss covered hereunder.

"\* \* \* \* \* \*

"Nothing herein contained shall be held to alter, vary, waive or extend any of the terms, conditions, agreements or limitations of the undermentioned policy other than as hereinabove stated.

"Effective 12:01 Standard Time, 02–03–59. Attached to and forming a part of policy number 990 115–B03–01 "Issued to HARRIS, EGERTON SWAN III by the STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY of Bloomington, Illinois."

On the first page of the policy, appear the name and address of Harris, III; the words "ASSIGNED RISK"; and in the space for "DESCRIPTION OF AUTOMOBILE," appears the following: "SEE END #6050.1." On the last line of the endorsement above referred to, the following numbers appear: "6050 (1.8151)."

Paragraph 4 of the endorsement, as we understand it, is an "excess insurance" clause and has the same effect as the excess insurance clause in General's policy.

The "pro rata" clause in the body of State Farm's policy, and the "excess" clause in the endorsement are contradictory. The pro rata clause says the insurer shall not be liable for a greater share of the loss than the ratio of its policy limit to the total, combined limits of all policies; while the excess clause in the endorsement says the insurer shall not be liable for any of the loss until other collectible insurance has been exhausted. We cannot reasonably suppose that the parties intended to make such a frustrating agreement.

■ The policy is properly to be interpreted from its four corners. Hill v. Ocean Accident & Guarantee Corp., 230 Ala. 590, 592, 162 So. 376.

■ The application clearly shows that the policy was issued to comply with the motor vehicle responsbility statutes. Insured applied for an operator's policy. The policy is made an operator's policy by the endorsement. The endorsement recites that the insurance afforded for bodily injury liability "applies subject to the following provisions." One of the "following provisions" is the "excess insurance" provision. The endorsement concludes with the provision that "Nothing herein contained shall be held to alter \* \* \* any of the terms \* \* \* of the undermentioned policy other than as hereinabove stated." This last complete sentence must mean that the terms of the undermentioned policy are altered "as hereinabove stated," that is, as stated in the endorsement.

For these reasons, we conclude that the controlling provision is the "excess insurance" provision set out in the endorsement.

■ We thus conclude that both policies contain "excess insurance" clauses. In that situation, a number of courts have held the clauses mutually repugnant and that the loss shall be apportioned between the two insurers. 69 A.L.R.2d 1122.

One court has said:

"Probably in no field of law is there more confusion among the courts as to the proper rule to be followed than in the field of excess insurance. \* \* \*" In-

surance Co. of Texas v. Employers Liability Assur. Corp., 163 F.Supp. 143, 145.

Three methods of apportionment have been applied. One method is to prorate the loss according to the premiums paid to the respective insurers. Insurance Co. of Texas v. Employers Liability Assur. Corp., supra.

Prorating according to amount of premium, however, was rejected in Cosmopolitan Mutual Ins. Co. v. Continental Casualty Co., 28 N.J. 554, 147 A.2d 529, 69 A.L.R.2d 1115, where the court said:

"* * * It is commonly known that the cost of liability insurance does not increase proportionately with the policy limits. The cost of increased limits is relatively small when compared to the cost of minimum coverage. The manner of contribution urged by Continental has recently been rejected. Insurance Co. of Texas v. Employers Liability Assur. Corp., 163 F.Supp. 143 (D.C.S.D.Cal. 1958). In that case the court pro-rated liability according to the premiums paid the respective companies. Although this latter test initially commends itself, upon reflection it appears that unless the insureds are in identical circumstances, there are too many variables affecting the premiums to permit them to form an adequate basis for an equitable adjustment, e. g., fleet insurance. We therefore conclude that as both companies stand on an equal footing equity requires an equal apportionment of the amount of the settlement and expenses. The judgment will accordingly be modified so as to require Continental to pay one-half of the settlement and expenses." (28 N.J. at page 564, 147 A.2d at page 534, 69 A.L.R.2d at page 1122)

The second method, which was used in Cosmopolitan v. Continental, supra, as stated by the court in that case, appears to rest on the premise that "both companies stand on an equal footing." If both policy limits were the same, both parties would stand on the same footing, but where, as in the instant case, one company insures up to $50,000.00 and the other up to $5,000.00, the parties do not stand on the same footing in all respects. With respect to their obligation to defend, however, we do think the parties stand on the same footing.

"* * * Both are responsible to defend on behalf of Thexton (the insured), but what obligation must each assume in respects to a recovery against Thexton?' * * *" (Par. Added) Continental Cas. Co. v. St. Paul Mercury F. & M. Ins. Co., 163 F.Supp. 325, 326, 327.

Both insurers assumed the same obligation to defend, and, for that reason each should bear the same share of the cost of defending the insured.

The third method of division of liability is set out in Lamb-Weston v. Oregon Auto. Ins. Co., 219 Or. 110, 341 P.2d 110, 346 P.2d 643, 76 A.L.R.2d 485, on rehearing. Both companies sought proration according to policy limits. One company had insured up to $25,000.00 and the other up to $5,000.00. The court decided that one company should bear 5/6 and the other 1/6 of the loss. The court said:

"Celina Mutual Casualty Co. of Ohio v. Citizens Casualty Co., 1950, 194 Md. 236, 241, 71 A.2d 20, 22, 21 A.L.R.2d 605, is urged as authority for the proposition that automobile liability insurance should be prorated in the same manner as fire insurance. The case is easily distinguishable on its facts, since both insurance policies there involved contained pro rata provisions. However, much language in the decision does point to the result urged by the companies:

"'There appears to be no very direct authority on the exact question. The general rule as to insurance policies is that where there are *pro rata* or proportionate clauses in several insurance policies insuring the same property, the insurance is concurrent and each insurer is liable for its proportionate amount. *This has also been held to be the rule where there is no*

*provision about proportionate insurance in either policy.* (Citations Omitted)'

"As seen above, in the case of fire insurance, when a loss is prorated in the ratio which the limits of the policies bear to the total coverage, the burden imposed on each insurer is generally proportional to the benefit which he received, since the size of the premium is most always directly related to the size of the policy.

"While distinction can be made between insurance underwriting practices in the field of fire insurance and automobile liability, it would seem that they are not sufficiently important to disturb the rule of proration sought by the companies in this case." (346 P.2d at page 647, 76 A.L.R.2d at pages 501, 502)

We adopt the *Lamb-Weston* rule as to proration of the $7,000.00 paid by General to the plaintiff who sued Harris, III, in the instant case. Authorities supporting this result may be found in the cases and annotations already cited.

The decree appealed from is modified as follows:

General should have judgment against State Farm for one-half of $1,841.43, the sum spent in defense of the action at law.

General should have judgment also for ⅟₁₁ of $7,000.00, the sum paid by General to plaintiff in the action at law.

General should have judgment also for interest on the above stated amounts as computed by the trial court in its decree.

The trial court taxed one-half the costs in that court against complainant and one-half against respondent. The costs of appeal are taxed in the same manner.

As modified the decree is affirmed.

Modified and affirmed.

LIVINGSTON, C. J., and LAWSON, SIMPSON, MERRILL, COLEMAN and HARWOOD, JJ., concur.