ST. PAUL MERCURY INSURANCE
COMPANY, a Minnesota Capital
Stock Company, Plaintiff,

v.

PENNSYLVANIA CASUALTY COMPA-
NY, a Pennsylvania Stock Insurance
Company, Defendant.

No. C85–0176(B2).

United States District Court,
D. Wyoming.

July 1, 1986.

Dan B. Riggs, Lonabaugh and Riggs, Sheridan, Wyo., for plaintiff.

Frederick G. Loomis, Loomis, Lazear, Wilson & Pickett, Cheyenne, Wyo., for defendant.

## MEMORANDUM OPINION AND ORDER

JOHNSON, District Judge.

This controversy comes to the Court on cross-motions for summary judgment, seeking judicial declaration of rights under certain insurance policies. 28 U.S.C. § 2201, *et seq.* The parties are both insurers of Memorial Hospital of Sheridan County, Wyoming, (Hospital). Plaintiff, St. Paul Mercury Insurance Company, (St. Paul) issued an insurance policy No. 683ND4529, effective July 1, 1983 through July 1, 1984. Defendant, Pennsylvania Casualty Co. (PCC) issued an insurance policy No. DO 0003 effective for the period of March 19, 1984, through June 30, 1984. The parties have entered into a stipulation of facts, which will be referred to throughout this opinion. In it, the parties have agreed that during the effective terms of both policies, claims were made against the Hospital and John Owen Yale, the Hospital administrator; W.G. Saunders, M.D., a member of the 1983 Executive Committee and a member of the 1984 ad hoc executive committee of the Hospital; Barry Wohl, M.D., a member of the 1984 Executive Committee of the Hospital; D. Scott Nickerson, M.D. and William Williams, M.D., physicians, who

practice medicine in Sheridan, Wyoming. These claims under the policies are based on a complaint filed in the United States District Court for the District of Wyoming, on December 21, 1984, alleging that the Hospital and its representatives deprived Reuben Setliff, M.D. of Sheridan, Wyoming, due process of law in actions involving his alleged property interest in practicing medicine and in an alleged liberty interest in his good name as a practicing physician pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution. It is further alleged in that complaint that the defendants acted in a negligent manner in conducting an investigation into the hospital practices of Dr. Setliff. By the filing of the instant action, the Court is asked to resolve the controversy between the insurers as to their potential liability among themselves in the event that the complaint of Dr. Setliff should be determined by settlement or judgment.[1]

The claims made by Dr. Setliff against the Hospital and its representatives, Yale, Wohl, and Saunders (the insured defendants) are within the express coverage of the policies issued by St. Paul and PCC. PCC has taken the position that the coverage provided by its policy is excess insurance, and that the St. Paul coverage is primary. After initially undertaking the defense of the insured, PCC instructed counsel employed by it to withdraw and since has not provided defense services for the insured defendants. St. Paul has contended that 1) both insurers are primary insurers; 2) the excess insurance clause of

PCC should be declared repugnant with the "other insurance" clause of St. Paul; 3) both insurers are obligated to defend the Setliff action and pay any losses arising from the settlement or trial of the Setliff action; 4) costs of defending and losses covered by both policies should be shared on a pro rata basis; and 6) the shares should be computed on a ratio to be determined by the ratio of the policy limits of each of the policies.

The parties have tendered to the Court in addition to a stipulation and other documentary evidence, affidavits of John Owen Yale, the administrator of the hospital; Matthew B. Townsend, the underwriting manager of PCC; and Tom Myers, an insurance broker for Van Gilder Agency of Sheridan, Wyoming. The affidavits establish that the PCC coverage was obtained by the hospital to insure the insured defendants for directors and officers liability arising from decisions related to hospital staff privileges. The PCC insurance policy was apparently obtained under the mistaken belief that a gap existed in coverage provided by of the St. Paul policy. The affidavits indulge in "if" reasoning related to how the insurance transaction would have differed "if" the parties had not acted under the mistaken belief that there was no coverage when actually coverage for the above liabilities existed within the St. Paul policy. While illuminating the circumstances surrounding the formation of the PCC contract with the hospital, the affidavits do not provide a resolution to the relationship between the St. Paul and PCC policies which were purchased by the hospital.[2]

---

1. PCC contends that the intent of the hospital administrator, John Owen Yale, in obtaining and causing issuance of the PCC policy is not relevant to these proceedings and specifically the cross-motions for summary judgment. On the other hand, St. Paul submits that intent is relevant as to the issue whether the policy written by PCC provides primary or excess insurance coverage. PCC submits that genuine issues of material fact exist in the event the intent of the hospital administrator is determined to be relevant in resolving the liability of the parties. *See,* Motion to Strike Trial Date filed herein by PCC on January 23, 1986.

2. The St. Paul policy provided in material part as follows:
    "WHAT THIS AGREEMENT COVERS: We'll pay amounts you and other protected persons are legally required to pay to compensate others for injury or death resulting from any of the following:—providing or failure to provide professional services—the actions of any formal accreditation board of yours or any similar board of yours, or;—the actions of those charged with carrying out such board or committee directives."
    The policy further confirmed that it provided protection to the corporation, its executive officers, trustees, directors and stockholders while

## I.

## WHETHER OR NOT THE EXCESS COVERAGE PROVISION OF THE PCC POLICY SHOULD BE GIVEN THE EFFECT OF NOT CONSTITUTING "OTHER INSURANCE" WITHIN THE MEANING OF THE ST. PAUL POLICY

■ The Court answers the first question, concluding that in this instance the excess coverage provision contained in the PCC insurance policy is to be given effect. In so doing, this Court rejects plaintiff's view that PCC's excess insurance clause should be declared repugnant to the "other insurance" clause in plaintiff's policy. This case leads into a thicket that offers divided authority and confusion to the Court as well as to the insurance profession.

"One problem in the field of insurance law that seems to have given the courts even more difficulty than coverage under an omnibus clause, or the matter of intentional acts under both personal and liability contracts, is that of duplicate, or overlapping, insurance. Confusion is apparent. This may be understandable, in part, when we consider that even companies do not seem to know precisely where they stand. In any event, they sue each other at the drop of a hat in order to secure a participation in the risk-taking process to the point that some courts have, in effect, stated: 'A pox on both their houses.'" 8A Appleman, Insurance Law and Practice, § 4906, p. 341.

The parties have pursued this action for the purpose of determining risk-taking participation, while the dismissal of the underlying civil action brought by Dr. Setliff

awaits appellate review.[3] The obligation of each insurer to cover losses that may occur as a result of the action brought by Dr. Setliff is affected by the provisions contained in each policy, related to the existence of other insurance.[4] Endorsement 43034(12–80) of the St. Paul policy reads:

"A professional liability loss that's covered under this agreement may also be covered under other insurance. If this happens, we'll pay that portion of the loss which the limits of coverage under the agreement are of the total of all limits that apply. But we won't pay more than the limits of coverage under this agreement."

The St. Paul clause is commonly known as a "pro rata" clause for the obvious reason that the language creates a formula for establishing the liability of the insurer when other, collectible insurance exists on a proportionate basis. The other insurance provision of the insurance policy written by PCC sharply contrasts with the St. Paul clause. It reads:

"OTHER INSURANCE. If an insured has other insurance for a loss covered by this policy, the rules below shall be used to FIX THE PORTION of the loss the company will pay.

(a) *The insurance afforded under this policy shall be excess over any other valid and collectible insurance.*

(b) If this insurance and the other insurance are both excess, the company will pay a portion of the loss under Rules (c), (d), and (e).

(c) Each insurer will first determine the amount of the loss it would pay

---

acting within the scope of their duties. They provided protection of the hospital administrator or chief executive officer while acting within the scope of his duties and provided protection to members of hospital boards and committees for claims resulting directly from their duties as members of the committees and boards.

3. The order of the United States District Court in Civil Action No. C84–0511–B was appealed by Dr. Setliff. That matter is pending review with Tenth Circuit Court of Appeals.

4. This opinion will not specifically treat the Health Care Facility Comprehensive General Li-

ability Protective Endorsement No. 43033(12–80) of St. Paul. As noted by the plaintiff at p. 11 of its brief:

" ... [t]his provision would have negligible, if any, applicability in this case, as it would not relate to the central claims of the Setliff action, but only to libel and slander claims, which do not relate to the insured hospital and are clearly barred by the statute of limitations as to individuals who may come within the scope of coverage of the policies carried by the hospital."

under the terms of its policy as if it were the only insurer. This loss represents its maximum share of the loss.

(d) If all the other insurance permits contribution by equal shares, the company will follow this method also. Under this approach, each insurer contributes equally until it has paid its maximum share or the loss has been paid in full, whichever comes first.

(e) If any of the other insurance does not permit contribution by equal shares, the company will contribute by limits. Under this method, each insurer's share of the loss is based on the ratio of its maximum share to the total of the maximum shares of all insurers."

This language is known as an excess coverage clause. It provides that if other valid and collectible insurance covers the occurrence, the "policy will provide coverage only for liability above the maximum coverage of the primary policy or policies." 8A Appleman, Insurance Law and Practice, § 4909, p. 384. Courts have struggled when these clauses have come into play in determining the manner that coverage will be available for a single occurrence.

The linch pin of plaintiff's summary judgment argument is that the "other insurance" clauses (St. Paul-pro rata and PCC-excess) should be declared to be repugnant and irreconcilable. Support for this position is found in the cases of *Lamb-Weston, Inc. v. Oregon Automobile Insurance Co.*, 219 Or. 110, 341 P.2d 110 (Or. 1959); *General Accident Fire and Life Assurance Corporation v. Continental Casualty Company*, 287 F.2d 464 (9th Cir. 1961) and *Liberty Mutual Insurance Company v. Truck Insurance Exchange*, 245 Or. 30, 420 P.2d 66 (Or.1966). The frustration experienced by the *Lamb-Weston* court in resolving competing "other insurance" clauses is evident in the following statement: "... it is our view that any attempt to give effect to the 'other insurance provision of one policy while rejecting it in another is like pursuing a will o' the wisp.'" *Lamb-Weston*, supra at pp. 115–116. The court wrote:

"The 'other insurance' clauses of all policies are but methods used by insurers to limit their liability, whether using language that relieves them from all liability (usually referred to as an 'escape clause') or that used by St. Paul (usually referred to as an 'excess clause') or that used by Oregon (usually referred to as a 'prorata clause'). In our opinion whether one policy uses one clause or another, when any come in conflict with the 'other insurance' clause of another insurer, regardless of the nature of the clause, they are in fact repugnant and each should be rejected in toto." *Id.* at 119.

The equitable rule of declaring "other insurance" clauses to be mutually repugnant or the *Lamb-Weston* Rule as it came to be known, expresses a judicial response to the perceived difficulty in giving preference to one clause over the other.

"The *Lamb-Weston* Rule presents an appealingly simple and no-nonsense way to deal with the vagaries of insurance policies. A principal concern of courts adopting this rule apparently is that one insurance company is getting 'stuck' and that regardless of the intent of the contracting parties is expressed in their 'other insurance' clauses, two companies covering the same risk should pay equally." *Jones v. Medox, Inc.*, 430 A.2d 488, 12 A.L.R. 4th 981, 987 (D.C.Ct.App.1981).

In its application the *Lamb-Weston* Rule provides a mechanistic solution to competing "other insurance" clauses, and it results in a pro ration of policy limits in resolving these claims. *Werley v. United Services Automobile Association*, AL. 498 P.2d 112 (1972); *Sloviaczek v. Estate of Puckett*, 98 Idaho 371, 565 P.2d 564 (1977). The pro rata sharing of losses was extended to expenses incurred in defending against the underlying action or negotiating for its settlement. *General Accident Fire and Life Assurance Corporation*, supra.

In Wyoming, the Supreme Court has declared certain "other insurance" clauses to

be repugnant when there has been overlapping coverage. The Supreme Court reasoned in *Farmers Insurance Exchange v. Fidelity Casualty Company of New York*, Wyo., 374 P.2d 754, 760 (1962), as follows:

"Where the excess insurance clauses of two policies are mutually repugnant, as we find them to be in the policies presently before us, the liability of the insurers must be prorated in proportion to the liability limits provided by the respective policies."

It is, however, important to examine the starting point in the court's analysis at p. 757 of the opinion.

"We can look only to the applicable insurance policy to find what insurance Farmers afforded. We cannot assume that it intended to provide coverages not expressed in its policy.

In an action involving the respective liability of two automobile liability insurers, the question is to be determined from a construction of the language employed by the insurers in their respective policies." (Citations omitted).

We are instructed that the Court should look to the language of the insurance policy in arriving determining whether or not the language competes.

The question of competing, excess insurance clauses came before the Court in *Wyoming Farm Bureau Mutual Insurance Company v. American Hardware Mutual Insurance Company*, Wyo., 487 P.2d 320 (1971). There the court held that the excess clauses were repugnant and that liability for losses must be pro rated in proportion to the liability limits of the respective policies. The court began with a "thorough examination of the pertinent provisions of the two policies...." See p. 321.

An analysis of the insurance agreements provided a point of departure for the Court in *Aetna Casualty and Surety Co. v. St. Paul Fire and Marine Insurance Co.*, 236 F.Supp. 289 (D.Wyo.1964). At p. 290, Judge Kerr states as follows:

"The court cannot increase the liability of the insurance companies as expressed in their policies nor can it assume that the companies intended to provide coverage not expressed in the policy."

The court found that neither of the "excess clauses" applied to the occurrence and that the pro rata provisions of the respective policies should govern, a situation that is distinguished from this case, but which gave effect to the intent expressed in the insurance policies then before the court.

Following the direction contained in earlier decisions and after examining the language of the policies here, the Court determines that the "excess" clause of PCC and the "pro rata" clause of St. Paul are entitled to receive the force and effect intended for each. It is not the purpose of this Court to assume a legislative status, unnecessarily giving unintended effect to otherwise clear contractual provisions. These insurers are not parties to the contract of the other. The existence of other insurance is serendipitous, especially in view of the facts here. Neither party relied upon the existence of insurance coverage on the part of the other. The facts are explicitly to the contrary in that the Hospital Administrator mistakenly believed that coverage did not exist under the St. Paul policy when he contacted PCC. The court in *Jones v. Medox, Inc.*, supra, at p. 987, 430 A.2d 488 describes the failure of the *Lamb-Weston* Rule to properly account for the language of each of the various policies.

"Courts swayed by this concern, however, have failed to recognize that the insurance companies have no contractual relationship with each other, and one company hardly needs to be protected from the other. Neither insurance company is getting 'stuck' for anything more than it contracted to provide for its insured. Moreover, courts applying the *Lamb-Weston* rule ignore a basic rule of contracts requiring consideration of all the language in a policy to determine its meaning and intent. By sweeping away the contractual language and, perhaps, the negotiated intent of the parties, the courts effectually are legislating mandatory pro rata clauses for insurance poli-

cies having 'other insurance' provisions." (Emphasis in original, footnotes omitted).

The PCC clause provides loss coverage only for amounts not covered by "valid and collectible insurance."

"Stated another way, these courts assume that standard phrase 'other valid and collectible insurance' means other valid and *primary* insurance. It follows, then, that the policy containing the pro rata clause is other valid and collectible primary insurance that triggers application of the excess clause in the second policy. The excess clause in the second policy therefore is given full effect and that carrier is liable only for the loss after the primary insurer had paid up to its policy limits. A policy containing the excess clause, however, is not considered to be other valid and collectible primary insurance for the purpose of triggering the operation of the pro rata clause, because when a stated contingency occurs, that is, when there is other valid and collectible primary insurance available to the insured, the policy continuing the excess clause becomes secondary coverage only." See *Jones v. Medox, Inc.*, supra at 12 A.L.R. 4th, 981, 986, 98 A.2d 371. (Emphasis in original, footnotes omitted).

The author in *Jones v. Medox*, in this writer's view correctly points out that the *Lamb-Weston* rule ignores the basic rule of contracts, requiring consideration of policy language in order to determine meaning and intent. The United States District Court in *Aetna Casualty and Surety Company v. St. Paul Fire and Marine Insurance Company*, supra, considered the policy language and the intent of the insurers in its determination that competing insurance policy clauses should be interpreted so that each insurer is required to contribute proportionately toward the loss. Effect was thus given to the meaning and intent of the policy language. This Court will give effect to the intent of the insuring parties, who have contracted with the insured hospital as expressed by the language contained in the insurance policies. Nevertheless, in appropriate cases, it may be necessary to declare "other insurance" clauses to be irreconcilable.

"Where, for example, the applicable portions of the two 'other insurance' clauses are identical excess clauses, even those courts adopting the majority view almost always require the insurers to apportion the liability. See, e.g., *State Farm Fire and Casualty Co. v. St. Paul Fire and Marine and Insurance Co.*, S.D., 268 N.W.2d 147, 149 (1978). Such cases present a true problem with circularity. Each insurer, claiming that the other must pay first, declines to pay at all. A literal interpretation of the policies containing conflicting excess clauses would leave the insured without any coverage where it first appeared that he had double coverage. In these cases, there is no rational reason to give the language of one policy preference over identical language in the other policy." (*Jones v. Medox, Inc.*, supra at 12 A.L.R. 4th 989, 98 A.2d 371, footnotes omitted).

The Wyoming Supreme Court acted in this matter in resolving the conflicting provisions of the insurance policies in *Farmers Insurance Exchange v. Fidelity and Casualty Company of New York*, supra; and *Wyoming Farm Bureau Mutual Insurance Company, Inc. v. American Hardware Mutual Insurance Company*, supra. The excess insurance clause contained in the PCC policy is given effect over the prorata clause contained in the St. Paul policy. ". . . [W]here there are two applicable insurance policies, one policy containing a prorata clause and the other an excess clause, the provisions of each will be interpreted to give effect to the intent of the contracting parties." *Jones v. Medox Inc.*, supra, at 12 A.L.R. 4th 989, 98 A.2d 371. See also, 8A Appleman, Insurance Law and Practice, § 4909.25, p. 409.

The underlying litigation initiated by Dr. Setliff may, if remanded, be determined by further litigation or settlement, both of which will determine this action as to an amount either within the limits of the St. Paul policy or in an amount in excess of that policy.

## II.

**WHAT SHOULD BE THE PROPER MANNER FOR PAYMENT OF LOSSES AND COSTS OF DEFENSE BY THE INSURERS AS DICTATED BY THE COURT'S DECISION?**

■ Regarding costs of defense, both policies contain provisions describing the insurer's duty to defend. PCC has withdrawn from the defense of the Setliff action, while St. Paul has continued to furnish defense services under its policy.[5] St. Paul contends, however, that the Court should pro rate defense costs in accordance with the St. Paul "other insurance" clause and the formula therein contained. In *Aetna Casualty and Surety Co. v. St. Paul Fire and Marine Insurance Company*, supra at 292, defense costs were pro rated in accordance with the pro rata provisions of both policies.

PCC is not as definitive in advocating a rule to be adopted with regard to defense costs. PCC has incurred defense costs up to the point in the litigation when it instructed the attorneys selected by PCC to withdraw from the defense, leaving the defense exclusively in control of St. Paul and counsel employed by St. Paul. Cases cited by the plaintiff, St. Paul, reflect the view that the duty to defend is an obligation of the insurer that is separate from any duty to pay losses and is more broadly construed. *Aetna Insurance Company v. Lythgoe*, Wyo., 618 P.2d 1057, 1061 (1980); *Boston Insurance Company v. Maddux Well Service*, Wyo., 459 P.2d 777, 779 (1967). This principle, standing alone, does not convey that an obligation exists for an excess coverage insurer to pay a pro rata share of the defense costs, based upon the relation of the face amount of its loss policy to that of the primary insurer.

The PCC policy describes its duty to defend under "Section 1—INSURING AGREEMENTS" as follows:

"The company shall have the right and duty to defend any suit against the insured seeking damages because of such injury even if any of the allegations of the suit are groundless, faults, or fraudulent. The company may make such investigation and settlement of any claim or suit as it deems expedient. The company shall not be obligated to pay any claim or judgment or to defendant any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements or, under coverage E, by payment of loss. The company shall have sole and final authority to select and retain counsel for the defense of any insured pursuant to the company's obligation under this policy."

Under "Section IV—EXCLUSIONS, the PCC policy provides in material part:

"This policy does not apply:

\* \* \* \* \* \*

(w) To any claim made against an insured;

(i) Which is insured by another valid policy or policies except in respect of any excess beyond the amount or amounts of payment under such other policy or polices; and

(ii) For which the insured is entitled to indemnity and/or payment by reason of having given notice of any circumstance which might give rise to a claim under any policy or policies, the term of which has expired prior to the initial effective date of this policy; or

\* \* \*."

The relationship of Section IV of the PCC policy to its agreement to defend is obscure; and neither party discusses in their memoranda the effect of the exclusionary language on the insuring clause for providing a defense.[6]

---

5. Both insurers have sent reservation of rights letters to the insured defendants. Stipulation of Facts at paragraph IV.

6. The extent to which the exclusion may be considered an "escape clause" by PCC has not been raised here. Both parties have treated this clause as well as the "other insurance clause" appearing at paragraph 5 on p. 11 of the PCC policy as excess coverage clauses.

PCC has directed the Court to the annotation entitled, "Defense Costs—Primary and Excess Insurers," 19 A.L.R. 4th 107, (1983), which attempts to catalog various fact situations for either or all of the primary and excess insurers in various situations either paid or did not pay defense costs. The classifications by fact situation reflect that author's analysis. Here, the Court is confronted with an uncertain outcome due to the appellate posture of the underlying claims against the insured defendants.

PCC incurred defense costs for the period prior to directing its counsel to withdraw defense services in behalf of the insured defendants. The relationship of counsel to the insurer (PCC) in such a situation is similar to that described in *Continental Casualty Company v. Zurich Insurance Company,* 57 Cal.2d 27, 17 Cal. Rptr. 12, 18, 366 P.2d 455, 461 (1961).

> "Rather, such services necessarily contemplate the employment by the company of competent licensed attorneys and other personnel who, from a practical standpoint, must be viewed as rendering services to the company and for its benefit and the benefit of other obligated insurers, as well as for the benefit of the insured."

In view of the relationship between counsel who have withdrawn from the litigation upon instruction by PCC and the insurer the failure of PCC to establish the necessity for and value of the services provided to the insureds and to St. Paul, and PCC having elected to take the position it was not obligated under the policy to incur costs for defense. It would seem inappropriate for PCC to be entitled to recover any sums for these services. PCC is not entitled to recover any part of these costs from the plaintiff.

■ Here, where both parties have a clause independent of the other, providing for a defense of the insureds, equity dictates that PCC should be required to share in the costs of the defense. In *Continental Casualty Co. v. Zurich Insurance Company,* supra, 17 Cal.Rptr. p. 18, 366

P.2d p. 461, the court ordered sharing of defense costs stating:

> "Under general principles of equitable subrogation, as well as pursuant to the rule of prime importance—that the policy is to be liberally construed as to provide coverage to the insured—it is our view that all obligated carriers who have refused to defend should be required to share in costs of the insured's defense, but if such costs were originally paid by the insured himself or by fewer than all of the carriers. A contrary result would simply provide a premium or offer a possible windfall for the insurer who refuses to defend, and, thus, by leaving the insured to his own resources, enjoys a chance that the costs of defense will be provided by some other insurer at no expense to the company which declines to carry out its contractual commitments."

The share to be paid by PCC shall be computed on the basis that both insurers will be liable for a pro rata share of the costs of defense in proportion to the amount of the Setliff claim each is required to pay. See *American Fidelity Insurance Company v. Employers Mutual Casualty Company,* 3 Kan.App.2d 245, 593 P.2d 14, 23 (1979) and *Millers Mutual Insurance Association of Illinois v. Iowa National Mutual Insurance Company,* 618 F.Supp. 301 (D.C.Colo.1985).

IT IS ADJUDGED:

1. That the St. Paul policy provides primary coverage for the claims arising from the Setliff litigation.

2. That the PCC policy contains an excess coverage clause, which is not repugnant to the "other insurance" clause contained in the St. Paul policy and which prevails over the pro rata clause contained in the St. Paul policy.

3. That the PCC policy is not "other insurance" within the meaning of the St. Paul "pro rata" clause.

4. That St. Paul shall pay losses, if any, resulting from settlement or trial of the Setliff claims up to the St. Paul policy

188

limits; and upon exhaustion of the St. Paul policy limits PCC shall pay for such losses until its policy limits are exhausted.

5. That PCC is not entitled to payment from St. Paul for so-called defense costs incurred by PCC to the point when it instructed its counsel to withdraw from the Setliff litigation.

6. That St. Paul is entitled to recover defense costs in accordance with the following:

"Where the claim is over the limits of the primary policy and only one insurer undertakes the defense, the primary insurer and the excess insurer will each be liable for a pro rata share of the costs of defense in proportion to the amount of the claim each is required to pay." *American Fidelity Insurance Company v. Employers Mutual Casualty Company*, supra.